UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KEVIN ANTHONY LEDET                          CIVIL ACTION

VERSUS                                       NO. 15-4651

CAROLYN W. COLVIN, ACTING                    SECTION "R" (2)
COMMISSIONER OF SOCIAL SECURITY

## REPORT AND RECOMMENDATION

Plaintiff, Kevin Anthony Ledet, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying plaintiff's claim for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under Titles II and XVI of the Act. 42 U.S.C. §§ 423, 1382c. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2(B).

I.      PROCEDURAL HISTORY

Ledet filed his applications for DIB and SSI on September 20, 2013, alleging disability beginning August 1, 2013, due to anxiety disorders, borderline intellectual functioning, "mental issues, no education, cannot read or write [and] screws in left ankle." (Tr. 96-97, 179-82, 186-89, 214). After his claims were denied at the agency level, Ledet requested a hearing before an Administrative Law Judge (ALJ), which was held on July 15, 2014. (Tr. 62-93). The ALJ issued a decision denying the applications on September 14, 2014. (Tr. 41-61). After the Appeals Council denied review on July 24, 2015, the ALJ's

decision became the Commissioner's final decision for purposes of this court's review. (Tr. 1-7).

Plaintiff filed a timely memorandum of facts and law.   Record Doc. No. 12. Defendant filed a timely reply memorandum.  Record Doc. No. 13.

## II.    STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.    The ALJ erred by finding that Ledet's mental impairments do not meet or medically equal Listing 12.05(C).

B.    The ALJ erred in her consideration of the opinion evidence.

## III.    ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

1.    Ledet has severe impairments consisting of borderline intellectual functioning and major depressive disorder.

2.    He does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, included specifically Listing 12.05 for intellectual disability.

3.    Plaintiff has the residual functional capacity to perform the full range of work at all exertional levels with the nonexertional limitations of work of a simple, routine nature with no public interactions and only occasional interactions with co-workers and supervisors.

4.    His severe impairments could reasonably be expected to cause some of the alleged symptoms.  However, his allegations that he is incapable of all work activity are not credible.

5.    Ledet can perform his past relevant work as a landscaper, barge loader and foundry fabricator.

2

      6.     He has not been under a disability from August 1, 2013, through the date of the ALJ's decision.

(Tr. 46-48, 53, 56).

IV.    ANALYSIS

    A.    Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Richard ex rel. Z.N.F. v. Astrue, 480 F. App'x 773, 776 (5th Cir. 2012) (citing Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005)); Stringer v. Astrue, 465 F. App'x 361, 363 (5th Cir. 2012) (citing Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002)).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Richard ex rel. Z.N.F., 480 F. App'x at 776; Stringer, 465 F. App'x at 363-64; Perez, 415 F.3d at 461.  This court may not reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision. Halterman ex rel. Halterman v. Colvin, No. 12-31099, 2013 WL 5913945, at *2 (5th Cir. May 9, 2013) (citing Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000)); Stringer, 465 F. App'x at 364.  The Commissioner, rather than the courts, must resolve conflicts in the

evidence.  Luckey v. Astrue, 458 F. App'x 322, 324 (5th Cir. 2011) (citing Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990)); Newton, 209 F.3d at 452.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Joubert v. Astrue, 287 F. App'x 380, 382 (5th Cir. 2008) (citing Perez, 415 F.3d at 461).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ray v. Barnhart, 163 F. App'x 308, 311 (5th Cir. 2006) (citing Perales, 402 U.S. at 390); Perez, 415 F.3d at 461.

To be considered disabled and eligible for SSI or DIB,[1] plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2014).  The regulations

---

[1]The relevant law and regulations governing claims for DIB and SSI are identical.  Carmon v. Barnhart, 81 F. App'x 410, 411 n.1 (3d Cir. 2003) (citing Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994)); Baltierra v. Chater, 70 F.3d 1268, 1995 WL 696740, at *1 (5th Cir. Oct. 19, 1995) (citing Haywood v. Sullivan, 888 F.2d 1463, 1467 (5th Cir. 1989)); Bryan v. Halter, 252 F.3d 1357, 2001 WL 422878, at *1 (5th Cir. Apr. 5, 2001) (citing Haywood, 888 F.2d at 1467).

include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.[2]  Id. §§ 404.1520, 416.920; Alexander v. Astrue, 412 F.  App'x 719, 720 (5th Cir. 2011) (citing Audler v. Astrue, 501 F.3d 446, 447 (5th Cir. 2007)); Perez, 415 F.3d at 461. The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Id.

The claimant has the burden of proof under the first four parts of the inquiry.  If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that he is capable of performing.  When the Commissioner shows that the claimant is capable of engaging in

---

[2]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

alternative employment, the burden of proof shifts back to the claimant to rebut this finding.  Alexander, 412 F. App'x 720-21; Perez, 415 F.3d at 461.

The court weighs four elements of proof when determining whether there is substantial evidence of disability: "'(1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history.'"  Chrisner v. Astrue, 249 F. App'x 354, 356 (5th Cir. 2007) (quoting Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991)); accord Perez, 415 F.3d at 463.

B.    Factual Background

Ledet testified that he was 37 years old and lived in a mobile home with his mother. (Tr. 65).  He stated that he completed the twelfth grade, but that his teachers allowed him to sleep and still pass the classes because they were tired of dealing with him.  He said he did not receive a diploma or a GED, but was in a program one step above special education. He testified that he tried machine shop vocational training, but could not do enough mathematics to pass.  Ledet stated that he had vocational training in cabinet-making, but that it "was just a big playground," the class "never really did anything" and he learned nothing. (Tr. 66-67).  He clarified that he went to high school classes for two to three hours and spent the rest of the day at a vocational training center for cabinet-making.  He said he received a certificate of completion.  (Tr. 73-74).

6

Plaintiff said he last worked as a landscaper in August 2013.  He testified that he held the job for five months, but quit because he was angry at his boss, who "was telling everybody my history and everything," and because the boss shortchanged him on his pay. (Tr. 67-68).  He stated that he worked at John W. Stone chemical plant loading and unloading barges for eight months until his employer realized that he could not read or spell very well, and "it went downhill from there."  (Tr. 68).  He said he had worked hanging sheetrock and painting between 2009 and 2011, but stopped because of pain in his ankle that prevented him from walking on stilts and limited what he could do.

Ledet testified that he cannot work because he has "real bad mental problems," including an inability to deal with people and being quick to anger.  He said he recently began treatment for these problems for the first time and that he receives counseling and medications from Drs. Strain and Shah[3] at Lurline Smith Mental Health Clinic every couple of weeks.  He testified that his doctors have not yet found the right combination of medications.  (Tr. 69).

Plaintiff said he has had screws in his left ankle since 1995 and that he broke all the bones in the toes of his right foot two to three years ago.  He stated that the only treatment he received was pain management at Charity Hospital in 2011, but that he had abused pain

---

[3]These names were phonetically transcribed in the transcript as String and Shore.  The medical records show that plaintiff's treating psychiatrist was Girishkumar Shah, M.D., and his therapist was John Strain, L.P.C. (licensed professional counselor).

pills and quit the treatment.  (Tr. 70, 90).  He testified that he stopped using pain pills three years before the hearing.

Ledet said he does not sleep much and usually stays in his room alone during the day, doing nothing, because he does not want to be around anyone.  (Tr. 70, 72).  He stated that his mother does all the cooking, cleaning, laundry, dishes and shopping, and that he helps once in a while.  He said he is not close to his mother.  He testified that she was a kid raising kids, that he "pretty much raised myself" and that he blames her for a lot of things. (Tr. 71).

Plaintiff said he does not go to the store, church or family reunions, or visit family or friends because he is not comfortable around a lot of people.  He stated that he does not work in the yard because his ankle swells and turns black and blue if he stands on it for long.  (Tr. 71-72).  He testified that he does not drive and did not renew his driver's license because his mind wanders and he could end up in another state.  He said he wound up in Las Vegas once, after Hurricane Katrina, because he was stressed out and just kept driving until he arrived there.

Ledet testified that he takes trazodone[4] and sertraline,[5] but that the medications do not work and he expected them to be changed at his next appointment.  He said he can walk

---

[4]Trazodone hydrochloride is a medicine used to treat depression.  PDR.net (PDR, LLC 2016), http://www.pdr.net/pdr-consumer-monograph/trazodone?druglabelid=3033&ConsumerId=1128 (visited Apr. 13, 2016).

[5]Zoloft (generic name: sertraline hydrochloride) is a selective serotonin reuptake inhibitor used to treat major depressive disorder and post-traumatic stress disorder.  Id., http://www.pdr.net/pdr-consumer-monograph/zoloft?druglabelid=474&ConsumerId=1503 (visited Apr. 13, 2016).

for a block or two before taking a break and can stand for four to five hours "before it [his left ankle?] starts hurting too bad." (Tr. 72-73). He said he can lift 60 to 70 pounds, but has problems using his hands because they shake badly, which began four to five years earlier.

Ledet stated that his major mental health problem is being unable to deal with people, but he also has problems when he is alone. He said he thinks about his past, which will not go away. He stated that every little thing, such as "if the TV messes up," irritates him unreasonably and he makes it into a big deal.

Plaintiff testified that he had a confrontation at his last job, but it was unusual for him to have problems with co-workers. (Tr. 74-75). He said he has a short temper and tried to hurt the other man in that incident. He stated that he was cutting a piece of board and deliberately let the board go, so it hit the man in the head.

Ledet stated that no one else lives with him and his mother. He said he argues with her, but would never hit her. He testified that she did not raise him and that he mostly lived by himself as a child. (Tr. 75). He said that his mother left him and his brother without any electricity, "gasoline" or water when the rent was due, and that he and his brother were evicted when he was between the ages of 10 and 13. He testified that he began using drugs at age 6 or 7, when his aunts and uncles "used to let us smoke weed and everything just to watch us eat. Then they usually give [sic] us pills just to see what it do to us before they take them." (Tr. 76).

Plaintiff confirmed that he had a long history of drug abuse. He said he quit abusing drugs when he was in rehabilitation for six months after he tried to commit suicide, probably in 2011. (Tr. 76-77). He testified that he has not used drugs or alcohol since then, and that his problems have gotten "way worse" since he stopped abusing drugs. He said he began going to Lurline Smith Clinic after he was hospitalized a second time at the beginning of 2013 and has gone to the clinic about every two weeks since then, depending on how well his medications work. He stated that he takes Remeron[6] as well as trazodone and Zoloft for depression and to help him sleep. (Tr. 77-78).

Ledet testified that he only sleeps two to three hours per night. He said he is jumpy and wakes up whenever he hears any little thing. He stated that he often awakens "fighting and sweating and everything," but does not have hallucinations. He said that his mind always wanders and he cannot concentrate on a conversation for more than three minutes. (Tr. 78-79).

Plaintiff testified that he does not watch television much. He said he sometimes watches the History Channel, but cannot watch anything with bombs or shooting because it brings back too many bad memories from his childhood of being abused and having seen people shot. He stated that, if he watches a one-hour television program, he has difficulty by the end remembering what happened at the beginning. (Tr. 79).

---

[6]Remeron (generic name: mirtazapine) is used to treat depression. Id., http://www.pdr.net/pdr-consumer-monograph/remeron?druglabelid=384&ConsumerId=5177 (visited Apr. 13, 2016).

Ledet said he does not read books or have any hobbies. He testified that he used to go fishing, but does not fish anymore because he has lost interest in everything. He estimated that he gets into a confrontation with other people, whether friends, family, neighbors or strangers, about three to four times a month. (Tr. 80). He stated that he has difficulty communicating with people because he does not understand what they are saying, but also that he has never had other people with whom to communicate. He said he talks to his counselor at Lurline Smith, but does not tell him everything. (Tr. 81).

Plaintiff stated that he has flashbacks to bad memories of his childhood every day and thinks about those things all day. He said his mother does not use drugs now. He testified that, although he has lived with his mother since he left the hospital in August 2013, they do not have a mother and son relationship, and their relationship is more like friends. He said he has lived with her off and on for a couple of years. (Tr. 82).

Ledet testified that he has no friends and does not let anyone get close to him. He said he does not talk to his brother, although his brother lives near him. He stated that he has nothing to say to his brother. Plaintiff said he has panic attacks every few months during which he gets very angry or agitated, sweats and feels like he cannot breathe. (Tr. 84). He testified that he has never gone to the hospital or a doctor because of a panic attack. He stated that the shaking in his hands is not the result of a physical injury and that his doctors think it is related to his anxiety. He said he has not had health insurance since his employment ended in 2011. He stated that he is not on Medicaid, but pays nothing for his treatment at Lurline Smith Clinic. (Tr. 84-85).

11

C.    Vocational Expert Testimony

A vocational expert, Karen Harrison, testified at the hearing that plaintiff's former work as a construction drywall installer and painter was semi-skilled at the heavy exertional level; his work as a landscaper was unskilled and heavy; his work as a barge loader and yard hand was unskilled and very heavy; and his work as a rebar fabricator or foundry laborer was unskilled and medium.  (Tr. 88-89).

The ALJ posed a hypothetical of a person with the same age, education and work experience as Ledet, who can work at all exertional levels, but only at a simple, routine job with no public interaction and occasional interaction with co-workers and supervisors. Harrison stated that such a person could perform plaintiff's past relevant work as a rebar fabricator, landscaper and barge loader.  (Tr. 43).

Upon questioning by plaintiff's attorney, Harrison confirmed that the claimant in the hypothetical could not perform Ledet's past relevant construction work because it was semi-skilled.  Plaintiff's counsel posed a second hypothetical with the additional limitation that the claimant could have no interaction with co-workers or supervisors.  Harrison testified that this restriction would eliminate all work.  (Tr. 90-91).  She stated that "occasional" is defined as up to 33 percent of the day.

The attorney posed another hypothetical that was the same as the ALJ's original hypothetical, but with the added restriction that the claimant would miss up to four days of work per month.  Harrison testified that there is no job that such an individual could perform.  She said that the industry standard is generally that a person can miss one day of

work per month, possibly a little more depending on the employee's skill level, and still maintain employment.  (Tr. 91).  Finally, plaintiff's counsel posed a hypothetical like the ALJ's original, with the added restriction that the person could not work around dangerous machinery.  Harrison stated that this limitation would eliminate Ledet's past relevant jobs as a fabricator and barge loader.  (Tr. 91-92).

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 47-53).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.    Plaintiff's Appeal

1.    The ALJ did not err by finding that Ledet's mental impairments do not meet or medically equal Listing 12.05(C).

The ALJ found at step two of the sequential evaluation that Ledet has severe impairments of borderline intellectual functioning and major depressive disorder.  The ALJ held at the third step that plaintiff does not meet or medically equal Listing 12.05(C) for intellectual disability (formerly known as mental retardation).  Specifically, the ALJ found that Ledet

> does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.  While the claimant obtained a full scale IQ of 70, the consultative examiner estimated his intellectual functioning to be in the low average to borderline range based on education and verbal ability.

13

(Tr. 48) (emphasis added).  "Mental retardation can be distinguished from borderline intellectual functioning.  Generally, a diagnosis of mental retardation requires an IQ score below 70, while borderline intellectual functioning includes individuals with an IQ ranging from 71 to 84."  Miller v. Astrue, No. 4:07-CV-2611, 2008 WL 8053474, at *4 (S.D. Tex. Sept. 8, 2008) (citing Bouton v. Astrue, No. 07-4039-JAR, 2008 WL 627469, at *6 (D. Kan. Mar. 4, 2008); American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41-42, 48, 49 (4th ed., text revision, 2000)).

Whether an impairment or combination of impairments meets a listing is a medical question that can be answered only by medical evidence.  20 C.F.R. §§ 404.1526(b), 416.926(b); McCuller v. Barnhart, 72 F. App'x 155, 158 (5th Cir. 2003); Selders, 914 F.2d at 619 (5th Cir. 1990); McKnight v. Astrue, No. 07-1654, 2008 WL 4387114, at *3 (W.D. La. Aug 15, 2008), report & recommendation adopted, 2008 WL 5746939 (W.D. La. Sept. 23, 2008), aff'd, 340 F. App'x 176 (5th Cir. 2009).  "The specified medical criteria [of a listing] are designed to be demanding and stringent because they lead to a presumption of disability making further inquiry unnecessary."  Anderson v. Astrue, No. 3:11-CV-0051-K-BH, 2011 WL 3331821, at *6 (N.D. Tex. July 11, 2011), report & recommendation adopted, 2011 WL 3347857 (N.D. Tex. July 29, 2011) (citing Sullivan v. Zebley, 493 U.S. 521, 532 (1990); Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994)).

"For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical

findings equal in severity to <u>all</u> the criteria for the one most similar listed impairment."

<u>Zebley</u>, 493 U.S. at 531 (citing 20 C.F.R. § 416.926(a); SSR 83-19, at 91).

"An impairment that manifests only some of the requisite criteria, no matter how severely, does not qualify.  If the plaintiff fails to demonstrate the specified medical criteria, the court will find that substantial evidence supports the ALJ's finding that listings-level impairments are not present."  <u>Gewin v. Astrue</u>, No. 10-1008, 2011 WL 3924232, at *3 (W.D. La. Aug. 3, 2011), <u>report & recommendation adopted</u>, 2011 WL 3954877 (W.D. La. Sept. 6, 2011) (citing <u>Zebley</u>, 493 U.S. at 530-31; <u>Selders</u>, 914 F.2d at 620); <u>accord</u> <u>Taylor v. Astrue</u>, No. 3-10-CV-1158-O-BD, 2011 WL 4091506, at *8 (N.D. Tex. June 27, 2011), <u>report & recommendation adopted</u>, 2011 WL 4091503 (N.D. Tex. Sept. 14, 2011), <u>aff'd</u>, 706 F.3d 600 (5th Cir. 2012).

Thus, Ledet must identify specific medical evidence demonstrating that he meets or medically equals <u>all</u> the criteria of Listing 12.05(C).  This listing provides:

> 12.05  Intellectual disability:  Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> . . . .
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

> The term "adaptive behavior" [or adaptive functioning] refers to the individual's progress in acquiring mental, academic, social, and personal skills as compared with other unimpaired individuals of his/her same age.  Indicators of adaptive behavior include childhood development milestones (e.g., when did the individual first crawl, walk, tie shoes, feed/dress self, etc.), as well as educational and social achievements.  The judgment of an MC [medical consultant] is necessary to affirm that adaptive behavior is consistent with IQ test results.

Fuller v. Astrue, No. 1:11-CV-117-BL, 2012 WL 3941775, at *6 (N.D. Tex. Sept. 10, 2012) (quoting Social Security Administration, Programs Operations Manual System § DI 24515.056(D)(2)) (now available at http://policy.ssa.gov/poms.nsf/lnx/0424515056)) (emphasis added).

> Before proceeding any further in the disability eligibility analysis, Appellant must satisfy the diagnostic definition of intellectual disability–he must demonstrate "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested before age 22."  Therefore, satisfying the intellectual disability definition of 12.05 is a prerequisite to considering [the severity criteria in paragraph] 12.05(A), (B), (C), or (D).

McCaskill v. Dep't of Health & Human Servs., No. 15-60304, 2016 WL 700220, at *2 (5th Cir. Feb. 22, 2016) (citing Randall v. Astrue, 570 F.3d 651, 656- 62 (5th Cir. 2009)) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05).  Thus, Listing 12.05 has three requirements:

> (a) the claimant presently satisfies the diagnostic description's substantive requirements [of significantly subaverage general intellectual functioning with deficits in adaptive functioning], (b) the claimant shows that the impairment satisfying the diagnostic description's substantive requirement manifested during the developmental period, and (c) the claimant presently exhibits the severity criteria.

Randall, 570 F.3d at 656 (footnote omitted) (emphasis added).  If plaintiff does not produce medical evidence to meet the first of these three requirements, the court need not examine whether he exhibits the severity criteria.  McCaskill, 2016 WL 700220, at *2.

Ledet argues that the ALJ erred by failing to find that he meets all three elements of Listing 12.05(C).  He contends initially that he satisfies the third, severity requirement because he had a valid, full scale IQ score of 70 on testing administered by a consultative examiner, M. Hunter Hansen, Psy.D. (Tr. 351), and because the ALJ found that plaintiff has another severe mental impairment of major depressive disorder.  The Commissioner does not dispute that Ledet had a full scale IQ score of 70 and another severe impairment.  Although Ledet attained a full scale IQ score within the Listing 12.05(C) range of intellectual disability, Dr. Hansen diagnosed borderline intellectual functioning, not intellectual disability.  (Tr. 351).  Based on plaintiff's education and verbal ability (he had a verbal IQ score of 74), Dr. Hansen opined that Ledet's intellectual functioning is in the low average to borderline range.  (Tr. 350-51).

The ALJ appropriately accorded significant weight to Dr. Hansen's report.  She accepted Dr. Hansen's uncontradicted medical opinion that Ledet has borderline intellectual functioning, not intellectual disability.  (Tr. 55).  Other medical evidence is in accord with Dr. Hansen.  Charlotte Ducote, Ph.D., reviewed Ledet's medical records on December 10, 2013, and also assessed him with borderline intellectual functioning.  Dr.

Ducote specifically found that plaintiff did not meet all the diagnostic criteria for mental retardation (using the old terminology) under Listing 12.05. (Tr. 101).

None of plaintiff's treating providers diagnosed him with intellectual disability or mental retardation. Tracy Cormier, a licensed clinical social worker at Lurline Smith Mental Health Clinic, performed a mental status examination of Ledet on August 30, 2013. Cormier checked a box on the examination report estimating Ledet's intellectual functioning as "Normal/Average." She did <u>not</u> check the adjacent boxes for borderline intellectual functioning or mental retardation. (Tr. 370). At plaintiff's initial psychiatric evaluation on September 4, 2013, his treating psychiatrist, Girishkumar Shah, M.D., described Ledet's intellect as "limited." (Tr. 366). Dr. Shah noted that plaintiff's intellect was "good" on October 31, 2013, and January 2, 2014, and that it was "fair" on May 30, 2014. (Tr. 375, 381, 384).

As with any medical evidence, the ALJ is not "required to accept a claimant's IQ score. Rather, the ALJ should examine the record to determine whether the proffered IQ score is reliable–that is, consistent with the claimant's daily activities and behavior. An ALJ may reject IQ scores if they are inconsistent with the record." <u>McGee v. Astrue</u>, 291 F. App'x 783, 787 (8th Cir. 2008) (citing <u>Miles v. Barnhart</u>, 374 F.3d 694, 699 (8th Cir. 2004)); <u>accord</u> <u>Adkins v. Astrue</u>, 226 F. App'x 600, 603 (7th Cir. 2007); <u>Markle v. Barnhart</u>, 324 F.3d 182, 187 (3d Cir. 2003); <u>Hamilton v. Shalala</u>, 39 F.3d 319, 1994 WL 612289, at *1-2 (5th Cir. 1994) (citing <u>Muse v. Sullivan</u>, 925 F.2d 785, 790 (5th Cir.

1991)); Calderwood v. Colvin, No. 4:14-CV-00495-CAN, 2016 WL 1077956, at *8 (E.D.

Tex. Mar. 18, 2016) (citing Christner v. Astrue, 498 F.3d 790, 793-94 (8th Cir. 2007);

Muse, 925 F.2d at 790; Pierre v. Sullivan, 884 F.2d 799, 803 (5th Cir. 1989)).

Ledet's full scale IQ score of 70 is not determinative of intellectual disability if the

evidence as a whole does not support a finding that he has significantly subaverage general

intellectual functioning with deficits in adaptive functioning.

> [A] Listing 12.05(C) claimant [must] satisfy the description's definition of
> mental retardation "in addition to" the severity criteria. An IQ between 60
> and 70 is "insufficient, even with the presence of some impairment, to
> establish disability per se on grounds of mental retardation. Rather, "[t]he
> key term in the introductory paragraph of section 12.05 of the regulation, so
> far as bears on this case, is 'deficits in adaptive functioning.'"

Randall, 570 F.3d at 660 (quoting Novy v. Astrue, 497 F.3d 708, 709 (7th Cir. 2007)).

The evidence substantially supports a finding that Ledet does not meet the listing's

initial criteria of significantly subaverage general intellectual functioning with deficits in

adaptive functioning. In Randall, as in the instant case, plaintiff had an IQ score of 69 and

another severe impairment that satisfied the paragraph C severity requirements. Based on

the same type of evidence as in the instant case, the Fifth Circuit affirmed the ALJ's finding

that plaintiff did not meet the substantive requirement of Listing 12.05.

> The ALJ, by relying on various kinds of evidence, including the . . .
> [examining psychologists'] reports, in particular, concluded that Randall
> failed to exhibit "significantly subaverage general intellectual functioning
> with deficits in adaptive functioning." After reviewing the record that was
> before the ALJ, we agree that her ultimate finding as to Randall's adaptive
> functioning was backed by substantial evidence. In particular, the ALJ was
> entitled to rely on the clinical psychologists' specific analysis of Randall's

> physical and mental capabilities, including the determination that she
> suffered from only "mild/borderline" adaptive retardation and that her
> impairments "would not preclude gainful competitive employment."

Id. at 662 (citation omitted) (emphasis added); see also Arce v. Barnhart, 185 F. App'x 437,

437-39 (5th Cir. 2006) (citing Morris v. Dretke, 413 F.3d 484, 487 (5th Cir. 2005); Selders,

914 F.2d at 619; 20 C.F.R. § 12.00(C)(1)) (Plaintiff with full scale IQ score of 69,

performance IQ of 66 and verbal IQ of 72 graduated from high school, was graded on a

modified scale in school, took some special education courses, reads at the fifth grade level,

spells at a sixth grade level and does arithmetic at the third grade level.  The examining

medical consultant found no deficits in adaptive functions.  The Fifth Circuit affirmed the

finding that plaintiff had borderline intelligence, was not mentally retarded and did not

meet Listing 12.05(C).); Cox v. Astrue, 495 F.3d 614, 618-19 (8th Cir. 2007) (Plaintiff with

IQ scores in mid- to upper sixties did not meet listing when examining doctor determined

that her adaptive functioning was "more consistent with 'borderline intellectual

functioning' than mental retardation."); West v. Comm'r of Soc. Sec., 240 F. App'x 692,

698 (6th Cir. 2007) (Plaintiff with verbal IQ score of 67, performance IQ of 72 and full

scale IQ of 66 did not meet listing when psychological examiners diagnosed borderline

intellectual functioning and plaintiff presented "absolutely no evidence that he experienced

deficiencies at all in 'adaptive functioning,' let alone that any such deficiencies arose

during the developmental period."); Selders, 914 F.2d at 619 (Plaintiff with verbal IQ score

of 70, performance IQ of 76 and full scale IQ of 72 functioned within borderline range of intelligence.).

Substantial evidence, including the opinions of Dr. Hansen and Dr. Ducote and plaintiff's contemporaneous treatment records, which the ALJ accurately summarized, support a finding that Ledet does not meet the substantive requirement of Listing 12.05. First, in addition to diagnosing borderline intellectual functioning, Dr. Hansen found that plaintiff's "mental health symptoms have not significantly impacted work functioning" or his activities of daily living. Dr. Hansen noted that plaintiff's social functioning and ability to complete tasks independently and timely were somewhat impaired. Ledet's mental status examination was within normal limits, except for a nervous mood, an anxious affect and a recent memory deficit. Dr. Hansen found that plaintiff's abilities to understand and carry out simple and detailed instructions, to maintain attention to perform simple tasks for two-hour blocks of time, and to sustain effort and persist at a normal pace over a 40-hour work week were all fair, while his abilities to relate to others and to tolerate the daily stress of work activity were fair to poor. (Tr. 349-52).

Second, the treatment records show that Ledet was hospitalized at the Medical Center of Louisiana–New Orleans from May 15 through 22, 2012, following a suicide

attempt by overdosing on Soma,[7] which he was regularly abusing along with Lortab.[8] Ledet responded well to treatment for major depressive disorder, post-traumatic stress disorder and substance abuse.  He was discharged in "much improved" condition with a recommendation for residential psychiatric treatment at Odyssey House.  (Tr. 319-23). There are no records of any followup treatment, although Ledet testified that he was in rehabilitation for six months after that hospitalization.

Plaintiff next sought medical treatment on August 22, 2013, at the Lakeview Regional Medical Center emergency room, after attempting suicide by taking 80 Tylenol PM tablets.  He was admitted to Eastern Louisiana Mental Health System and treated for major depressive disorder, recurrent, severe, and cannabis abuse.  His psychiatrist noted that plaintiff had been noncompliant with outpatient treatment recommendations.  Ledet responded well to treatment and was discharged on August 28, 2013, in improved condition with a fair prognosis, if he followed treatment recommendations and abstained from using marijuana.  (Tr. 303-07).

Plaintiff then entered outpatient treatment with Dr. Shah and licensed professional counselor John Strain.  At each visit to Dr. Shah from September 4, 2013, to May 30, 2014,

---

[7]Soma (generic name: carisoprodol) "is used to relieve discomfort associated with short-term, painful musculoskeletal conditions."  Id., http://www.pdr.net/pdr-consumer-monograph/soma?druglabelid=2128&ConsumerId=1409 (visited Apr. 27, 2016).

[8]Lortab (generic name:  hydrocodone) "is a combination of acetaminophen (Tylenol) and the opioid pain medication hydrocodone, used to treat moderate to moderately severe pain."  PDRhealth (PDR Network, LLC 2015), http://www.pdrhealth.com/drugs/lortab (visited Sept. 29, 2015).

the doctor described Ledet's symptoms as mild or moderate and noted that his mood and other symptoms improved with medication and counseling. (Tr. 365-66, 374-75, 380-81, 383-84). Plaintiff declined to attend counseling more often than every two to three months. (Tr. 385). On April 28, 2014, Strain observed that plaintiff's medications were helping and that he had good energy, worked in the yard and house, went into the woods to go fishing, functioned well enough for himself and his mother (with whom he lived) and, although unhappy, was not willing to make any changes to seek contentment. (Tr. 377). On June 23, 2014, Strain encouraged Ledet to look at things differently and commit to doing things, but noted that plaintiff was "dug in with this depressed mood." (Tr. 373). The medical evidence, consisting of the treatment notes and the opinions of Drs. Hansen and Ducote, therefore substantially supports a finding that Ledet does not have significantly subaverage general intellectual functioning with deficits in adaptive functioning.

Ledet argues that he satisfies the second, temporal requirement that his deficits in adaptive functioning manifested before age 22, citing his testimony that he was in classes one level above special education and received a certificate of completion, rather than a diploma. His testimony is the only evidence of his adaptive functioning before age 22. Tacitly acknowledging that his testimony is not medical evidence, which is required to show that he meets or medically equals a listing, Ledet relies on Copeland v. Colvin, 771 F.3d 920, 927 (5th Cir. 2014) (citing Hodges v. Barnhart, 276 F.3d 1265, 1269 (11th Cir. 2001)), to argue that the Fifth Circuit adopted a rebuttable presumption that an IQ score of

60 through 70 obtained on testing after age 22 demonstrates intellectual disability that manifested before that age.  This is an incorrect reading of Copeland.

The issue in Copeland was whether plaintiff had performed her past work at the level of "substantial gainful activity."  If she had not performed at that level, her work was not "past relevant work" for purposes of step four in the sequential evaluation.  Id. at 925. Plaintiff urged the Fifth Circuit to adopt a rebuttable presumption that past work was not substantial gainful activity when a claimant's earnings did not exceed the Commissioner's guidelines on the subject.  The Fifth Circuit agreed, noting that "a rebuttable presumption favoring a claimant, while perhaps unusual, is not incompatible with the plaintiff's burden of proof."  Id. at 926.  The court then cited the Eleventh Circuit's Hodges decision as an example of another court having found a rebuttable presumption that favored a disability claimant, albeit in a different context.  Id. at 927 (citing Hodges, 276 F.3d at 1269) ("(holding that a low IQ test taken after age 22 creates a rebuttable presumption of intellectual disability dating back to one's youth)").  This dictum in Copeland did not adopt the Hodges presumption, and the Fifth Circuit has never adopted such a presumption.

In Randall, the Fifth Circuit declined to consider a rebuttable presumption that IQ scores of 60 through 70 obtained on testing as an adult establish that adaptive deficits manifested before age 22.  See Randall, 570 F.3d at 656 n.8 (citing Markle, 324 F.3d at 188; Hodges, 276 F.3d at 1268-69; Branham v. Heckler, 775 F.2d 1271, 1274 (4th Cir. 1985)) (While "several circuits presume that an impairment was 'initially manifested

during the developmental period' if the claimant establishes the requisite impairment in the present[, o]thers refuse to erect such a presumption. . . .  [W]e need not opine on this issue."); <u>see also</u> <u>Blanks v. Colvin</u>, No. 3:14-CV-303, 2015 WL 2240740, at *8 (S.D. Tex. May 11, 2015) ("[T]he Fifth Circuit has not followed other circuits in expressly adopting a presumption that I.Q. remains stable over an individual's lifetime."); <u>Romero v. Astrue</u>, No. 07-0234, 2009 WL 1928961, at *3 (W.D. La. July 1, 2009) ("Though this presumption has been adopted by various Circuit courts, there is no evidence that the presumption exists in the Fifth Circuit.").

Ledet fails in his burden to produce medical evidence that he meets either the initial diagnostic or the temporal requirements of Listing 12.05.  Without satisfying those criteria, he cannot meet the listing, regardless whether he satisfies the severity criteria of paragraph C. <u>Randall</u>, 570 F.3d at 659-60.  However, as discussed above, substantial evidence supports the ALJ's finding that he does not meet the severity criteria.

Plaintiff argues that the ALJ failed to discuss whether his impairment was medically equivalent to Listing 12.05(C).  However, the ALJ stated that she considered the listing and found that Ledet's impairments did not meet <u>or medically equal</u> the required criteria.  (Tr. 47).  Whether a claimant's impairments meet or medically equal a listing is a legal question reserved to the Commissioner.  <u>Avery v. Astrue</u>, 313 F. App'x 114, 120-22 (10th Cir. 2009); <u>Cain v. Barnhart</u>, 193 F. App'x 357, 361 (5th Cir. 2006); <u>Williams v. Colvin</u>, No. 4:14-CV-114-BJ, 2015 WL 1288348, at *7 (N.D. Tex. Mar. 20, 2015) (citing 20 C.F.R. §§

404.1526(c), 416.926(c), 404.1527(e), 416.927(e); Soc. Sec. Ruling 96-6p, 1996 WL 374180, at *3 (July 2, 1996)).  The medical records summarized in the ALJ's decision and discussed above substantially support the finding that Ledet's impairments are not medically equivalent to Listing 12.05(C).

Accordingly, this assignment of error lacks merit.

### 2.   The ALJ appropriately considered the opinion evidence.

Ledet contends that the ALJ erred in her consideration of the opinion evidence. Specifically, plaintiff argues that the ALJ erred by rejecting the opinions of his therapist, Strain, on a checklist form dated May 23, 2014, that Ledet has <u>moderate</u> limitations in his activities of daily living and his concentration, persistence and pace; has <u>marked</u> restrictions in maintaining social functioning and in episodes of deterioration or decompensation in work-like settings;[9] and would be likely to miss more than four days of work per month.  (Tr. 362-64).  The ALJ accepted Strain's opinion that plaintiff has moderate limitations in concentration, persistence and pace.  However, based on the entire record, the ALJ found that Ledet has <u>mild</u> limitations in his activities of daily living and <u>moderate</u> difficulties in maintaining social functioning, and had one or two, but not repeated, episodes of decompensation of extended duration.  (Tr. 47).  The ALJ found that plaintiff's allegations regarding more extreme limitations were not credible.  She took into

---

[9]The standards for establishing disability per se based on mental disorders do <u>not</u> include whether a claimant has some degree (mild, moderate or marked) of "restrictions" in episodes of deterioration or decompensation, a formulation on Strain's preprinted form that simply makes no sense.  Rather, the listings require "[r]epeated episodes of decompensation, each of extended duration."  <u>E.g.</u>, 20 C.F.R. § Pt. 404, Subpt. P, App. 1, §§ 12.04(B), 12.05(D)(4), 12.06(B).

account his limited mental health treatment, his history of noncompliance with treatment recommendations and the significant improvements that he experienced when he sought and complied with treatment.  (Tr. 53-54).

The ALJ stated that she "gave full consideration to" Strain's statement.  However, she noted that Strain is a licensed professional counselor, which is an "other" source that is not entitled to the same weight as an "acceptable medical source," like Dr. Hansen.  (Tr. 55) (citing 20 C.F.R. §§ 404.1513, 404.1527, 416.913, 416.927).

> This distinction is material because only "acceptable medical sources" can provide "medical opinions" to show the severity of a claimant's impairment and how it affects [his] functional ability.  Although the ALJ is required to consider evidence from "other sources" when evaluating an "acceptable medical source's" opinion, "the fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because, . . . 'acceptable medical sources' 'are the most qualified health care professionals.'"

Patterson v. Astrue, No. 10-0600, 2011 WL 6157475, at *8 (W.D. La. Apr. 13, 2011) report & recommendation adopted, 2011 WL 2294807 (W.D. La. June 8, 2011) (quoting 20 C.F.R. §§ 1527(a)(2), 416.927(a)(2); SSR 06-03p) (citing Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Reynolds v. Astrue, No. 1:08cv228-SAA, 2010 WL 583918, at *7 (N.D. Miss. Feb. 16, 2010)).

Licensed professional counselors are not acceptable medical sources.  Kenny v. Colvin, No. A-15-CV-509-AWA, 2016 WL 1369592, at *3 (W.D. Tex. Apr. 6, 2016) (citing Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005); 20 C.F.R. §§ 404.1513(a),

416.913(a)); Hunt v. Astrue, No. 4:12-CV-244-Y, 2013 WL 2392880, at *11 n.14 (N.D. Tex. June 3, 2013) (citing Zumwalt v. Astrue, 220 F. App'x 770, 780 (10th Cir. Mar. 22, 2007)) (additional citations omitted); Hoelck v. Barnhart, No. A-06-CA-526, 2007 WL 496850, at *2 (W.D. Tex. Feb. 6, 2007), aff'd, 261 F. App'x 683 (5th Cir. 2008).

While the ALJ afforded significant weight to those portions of Strain's opinions that she found supported by the evidence as a whole, she gave no weight to the more extreme limitations that he assessed. She explained that she discounted those limitations because they were based on plaintiff's subjective reports, which she found not entirely credible, and on Strain's limited treatment of Ledet during a period when plaintiff was not compliant with prescribed medication. (Tr. 55).

As she is required to do, the ALJ assessed the credibility of the witnesses and weighed and resolved conflicts in the evidence. "The ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'" Ramirez v. Colvin, 606 F. App'x 775, 779 (5th Cir. 2015) (quoting Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); accord Yates v. Colvin, 606 F. App'x 225, 229 (5th Cir. 2015) (citing Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994)). "[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Newton, 209 F.3d at 455 (quotation omitted).

Here, the ALJ weighed the conflicting opinions of Strain and Dr. Hansen and resolved the conflict in favor of Dr. Hansen's opinions and Dr. Shah's treatment records,

which do not support the extreme limitations that Strain assessed.  Escalante v. Astrue, 286 F. App'x 179, 180 (5th Cir. 2008) (citing Griego, 940 F.2d at 945; Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990)).  As the ALJ stated, Dr. Hansen's findings are thoroughly documented, well explained and not contradicted by any treating or examining physician or psychologist.

The ALJ had good cause to afford no weight to Strain's opinions of extreme limitations, not only because a licensed professional counselor is not an acceptable medical source, but also because his assessment was based in large part on plaintiff's own reports of his symptoms.  Williams v. Colvin, 575 F. App'x 350, 355 (5th Cir. 2014); Greenspan v. Shalala, 38 F.3d 232, 237-38 (5th Cir. 1994); Barbee v. Barnhart, 54 F. App'x 406, 2002 WL 31688886, at *3  (5th Cir. Oct. 29, 2002); Nguyen v. Colvin, No. 4:13-CV-2957, 2015 WL 222328, at *9 (S.D. Tex. Jan. 14, 2015).

The record substantially supports the ALJ's conclusion that Ledet had a history of noncompliance with treatment recommendations and a limited treatment record with Strain when Strain rendered his opinions.  According to the medical record, plaintiff had no followup treatment after his May 2012 hospitalization until another emergency hospital admission on August 22, 2013.  After discharge from the hospital, he initiated outpatient treatment on August 30, was evaluated by Dr. Shah on September 4 and saw Strain for the first time on September 9, 2013.  (Tr. 365, 368, 387).  Ledet saw Strain on September 30, 2013 (Tr. 386), then saw both Strain and Dr. Shah on October 31, 2013, and January 2,

2014.  (Tr. 380-85).  On February 20, 2014, a nurse practitioner at Interim LSU Public Hospital noted that Ledet had not taken any psychiatric medications for one month.  (Tr. 388-90).  Ledet failed to appear for appointments with Dr. Shah and Strain on March 6, 2014.  (Tr. 378-79).  He saw Strain for the fifth time on April 28, 2014 (Tr. 377), and Strain completed his checklist form on May 23, 2014.  Ledet saw Dr. Shah for the last time on May 30, 2014 (Tr. 374), and saw Strain for the last time on June 23, 2014.  (Tr. 373).  Plaintiff refused Strain's offer of more frequent counseling and declined to make any effort to change to improve his mood.  (Tr. 377, 385).

A claimant's lack of need for strong medication or a failure to seek treatment are relevant factors to consider in determining the severity of an alleged impairment and may be used in conjunction with the medical reports to discount his complaints of disabling limitations.  Clayborne v. Astrue, 260 F. App'x 735, 737 (5th Cir. 2008); Doss v. Barnhart, 137 F. App'x 689, 690 (5th Cir. 2005); Bryan v. Halter, 252 F.3d 1357, 2001 WL 422878, at *2 (5th Cir. Apr. 5, 2001) (citing 20 C.F.R. §§ 404.1530, 416.930; Wren v. Sullivan, 925 F.2d 123, 128 (5th Cir. 1991)).  Furthermore, plaintiff's "failure to seek treatment for depression is an indication of nondisability."  Doss, 137 F. App'x at 690 (citing Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990)).

Based on Newton, 209 F.3d at 456, plaintiff argues that the ALJ must expressly consider the six factors in 20 C.F.R. § 404.1527 whenever the ALJ discounts a treating

source's opinion.  First, as discussed above, Strain is not an acceptable medical source. Newton and Section 404.1527 only apply to the opinions of acceptable medical sources.

Second, even if Newton applied to Strain's opinions, the Fifth Circuit concluded in that case "that, absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)."  Id. at 453 (emphasis added); see also Thibodeaux v. Astrue, 324 F. App'x 440, 445 (5th Cir. 2009) (citing Newton, 209 F.3d at 453, 456) (When the record contained "reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, . . . the ALJ was not required to apply the criteria set forth in 20 C.F.R. § 404.1527(d)(2).") (emphasis added).  The ALJ in the instant case reviewed and relied on reliable medical evidence from both a treating psychiatrist, Dr. Shah, and an examining psychologist, Dr. Hansen, neither of whose opinions supported the more extreme limitations that Strain assessed.  In these circumstances, the ALJ was not required to perform a detailed analysis of the Newton factors.

The ALJ carefully considered, but ultimately rejected, Strain's conclusion that plaintiff has moderate limitations in his activities of daily living and marked restrictions in maintaining social functioning and in episodes of deterioration or decompensation, based on the entire record that she found credible.  "[T]he Act empowers the ALJ to analyze the

31

physicians' testimony.  Substantial evidence supports the ALJ's decision to disregard [Strain's] conclusions.  That basis is enough to survive our review."  Greenspan, 38 F.3d at 237.

Finally, Ledet argues that the ALJ's determination that he could perform work of a simple, routine nature with no public interactions and only occasional interactions with co-workers and supervisors failed to include the moderate limitations in concentration, persistence and pace that the ALJ assessed in his residual functional capacity.

> However, the Fifth Circuit has held that a hypothetical that includes "restrictions to rare public interaction, low stress, and simple, one- to two-step instructions reflect that the ALJ reasonably incorporated [the claimant]'s moderate concentration, persistence, and pace limitations such that the hypothetical question was proper."  Bordelon v. Astrue, 281 F. App'x 418, 423 (5th Cir. 2008) (unpubl.) (citation omitted).  Citing Bordelon, other courts in this circuit have held that an RFC [residual functional capacity] limited to simple work reasonably incorporates a moderate or even marked limitation in concentration, persistence, or pace.

Cook v. Colvin, No. 13-3046, 2015 WL 893053, at *13 (W.D. La. Mar. 2, 2015) (footnote omitted) (citing Reid v. Astrue, No. 10-0237, 2011 WL 4101302 (S.D. Miss. Aug. 15, 2011), report & recommendation adopted, 2011 WL 4101277 (S.D. Miss. Sept. 8, 2011); Madrid v. Colvin, No. 12-800, 2013 WL 6641305 (N.D. Tex. Dec. 17, 2013); Cornejo v. Colvin, No. 11-470, 2013 WL 2539710 (W.D. Tex. June 7, 2013)); accord Williams v. Colvin, No. 4:14-CV-114-BJ, 2015 WL 1288348, at *6 (N.D. Tex. Mar. 20, 2015); Davis v. Astrue, No. 13-00065-BAJ, 2014 WL 4386367, at *8 (M.D. La. Sept. 4, 2014).

Accordingly, this assignment of error lacks merit.

CONCLUSION

Substantial evidence supports the ALJ's finding that Ledet's mental impairments do not meet or medically equal Listing 12.05(C). The ALJ appropriately weighed and resolved conflicts in the opinion evidence.

**RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[10]

New Orleans, Louisiana, this _____3rd_____ day of May, 2016.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[10]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.